IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WESTERN CONVENIENCE STORES, Inc., | ) ) | CASE NO. 8:07CV270 |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | MEMORANDUM AND ORDER |
| v. | ) ) | |
| BURGER KING, Corporation, | ) ) | |
| Defendant. | ) | |

This matter is before the Court on the Plaintiff's Motion for a Preliminary Injunction, which was filed in state court and is included in Filing No. 1, and on the Defendant's Motion to Dismiss, or Alternatively, to Transfer, which is at Filing No. 11. Both parties requested expedited consideration of their motions, and a hearing on both motions was conducted on Thursday, August 30, 2007.  The Brief in Support of the Motion for Preliminary Injunction has been filed by Plaintiff Western Convenience Stores, Inc. ("Western"), and the Brief in Opposition to the Motion was filed by Defendant Burger King Corporation ("BKC"). (Filing No. 1, Document 1-4, pp. 29-46; and Filing No. 23 ). Briefing on the Defendant's Motion to Dismiss or, Alternatively, to Transfer was completed on August 31, 2007.  (Filing Nos.12 and 30). Evidence has been submitted by both parties.

**PROCEDURAL BACKGROUND**

This case was commenced in the district court of Keith County, Nebraska, on June 19, 2007. The Complaint filed by Plaintiff Western Convenience Stores, Inc. ("Western") alleges that it is entitled to compensatory and injunctive relief against the Defendant Burger King Corporation ("BKC") based on BKC's refusal to transfer, renew, or grant a franchise to Western that it intended to operate from an Ogallala, Nebraska, convenience store.

(Filing No. 1, Document 1-2, p.1, Complaint in Case No. CI07-95).  On the same date that the Complaint was filed, Western sought a temporary restraining order ("TRO") that was granted by the state court judge ex parte.  (Filing No. 1, Document 1-3, page 4).  In the order granting the temporary injunctive relief, the state court judge set the hearing on the motion for a preliminary injunction for July 16, 2007. (*Id.*).

BKC filed a motion to dissolve the TRO and a hearing was held on that motion, during which evidence was received.  (Filing No. 1, Document 1-3, page 8).  The motion to dissolve the TRO was denied on July 12, 2007, four day before the hearing on the preliminary injunction motion was to be heard.  (Filing No. 1, Document 1-4, page 47). Days before the scheduled preliminary injunction hearing, BKC removed the case to federal court.

This Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. §1332.  After removal, Western did nothing to protect the TRO.  On August 8, 2007, BKC filed a motion to dismiss or, alternatively, to transfer based on improper venue.  (Filing No. 11)  On August 13, 2007, Western requested a ruling on the motion for preliminary injunction or a hearing on the motion. (Filing No. 14)  According to Tom Wolfgang, a District Manager for Western, on August 28, 2007, Burger King cancelled the regularly scheduled bi-weekly delivery of products for Store No. 9820.  This was the first cancelled order since Western took over the restaurant in October 2006, and prompted the requests for immediate consideration of the pending motions.  (Filing No. 22, Wolfgang Aff. ¶¶ 2, 3).

**FACTUAL BACKGROUND**

The material facts are not in dispute.  On or about June 21, 1996, S.B.F.F. Inc. (hereafter "SBFF") and BKC executed a Franchise Agreement, which included several addenda, through which BKC granted franchise rights to SBFF to operate a Burger King restaurant in Ogallala, Nebraska for a period of ten years.[1]  Addendum C to the Franchise Agreement authorizes the franchisee to operate the restaurant in a non-traditional facility, and it was operated as part of a convenience store.  On or about the same date, W.D. Sapp executed a Guarantee and indemnification agreement in connection with SBFF's franchise in favor of BKC.  Pursuant to an August 3, 2006, agreement between SBFF and BKC, the franchise agreement was extended through June 20, 2007.

On or about October 25, 2006, Sapp Brothers Petroleum, Inc., presumably a successor to SBFF, sold the Ogallala property to Pro Mart, Inc.  A copy of this document is attached to the Taraghi's Affidavit in Exhibit A.  A few days later, on October 28, 2006, Pro Mart sold the Ogallala property via the Purchase Sell Agreement to HDT, LLC..  HDT, L.L.C. is a subsidiary owned by Hossein Taraghi, who is also President of Western.   In

---

[1] This franchise agreement will be referred to hereafter as "Franchise Agreement."

Filing No. 1 contains documents offered in support of the motion for preliminary injunction, including: Affidavit of Hossein Taraghi and Exhibits A-D thereto: Exhibit A is the Agreement to Purchase and Sell between Pro Mart Inc. and HDT, Inc., hereafter referred to as the "Purchase Sell Agreement;" Exhibit B is the Amendment to the Purchase Sell Agreement, hereafter referred to as the "Amendment"; Exhibit C is the June 11, 2007,correspondence from Taraghi's counsel to BKC; and Exhibit  D is an e-mail from BKC to Taraghi.

Filing No. 1 also contains document offered by the Defendant in support of its motion to dissolve the state-issued TRO, including the Affidavit of Stephanie Doan, and Exhibits 1-_ thereto: Exhibit 1 is the Franchise Agreement and the August 3, 2006 Extension Agreement hereafter "Extension Agreement"; Exhibit 2 is the Guarantee signed by WD Sapp; Exhibit 3 is Padilla's March 19, 2007 written denial of Taraghi's franchise application; Exhibit 4 is an e-mail relating to the incompleteness of Taraghi's on-line application.

Future references to evidence contained in filing no. 1 will be to the document name.

addition to the Purchase Sell Agreement, and also on October 28, 2006, Pro Mart and HDT signed an Amendment to Agreement to Purchase and Sell, which stated that Pro Mart "agrees to transfer any right to the Burger King franchise, if any and if any rights are transferable, and to further assist Purchaser to establish a working relationship with Burger King . . . ."  The Extension Agreement executed by SBFF, W.D. Sapp, and BKC was referenced and attached as an exhibit to the Purchase Sell Agreement between Pro Mart and HDT, but the Franchise Agreement between SBFF and BKC, though referenced in the Purchase Sell Agreement, was not attached to it.[2]

In Hossein Taraghi's affidavit, offered in support of the motion for preliminary injunction, he states that immediately upon execution of the purchase agreement and amendment with Pro Mart, he called BKC's employee Sue Stilmock to inform her of his desire to "renew" the Ogallala franchise and "formally transfer the same" to him.  Stilmock confirms the contact, but recalls that it was in the February 2007 time frame.  (Filing No. 1, Taraghi Affidavit; Filing No. 24, Stilmock Aff. ¶ 4). Stilmock gave Taraghi the phone number for Jose Padilla and directed Taraghi to BKC's website. Taraghi at least partially completed an on-line application.  (Filing No. 1, Taraghi Aff. p. 18, ¶ 5).

Following BKC's preliminary investigation of Taraghi's at least partially completed application for a franchise, Jose Padilla, Director of Franchising for BKC, phoned Taraghi

---

[2] With regard to the Burger King restaurant that was operate in Ogallala, the Purchase/Sell Agreement states: "Purchaser acknowledges that Seller has entered into a Burger King franchise agreement for operation of a Burger King restaurant at the Ogallala location.  Attached as Exhibit D, is a copy of the Burger King franchise extension agreement.  The current agreement expires in June 2007 and Purchaser is obligated to operate the Burger King franchise, and to pay over-rides to Burger King until expiration of this agreement with Seller.  Seller warrants that the Burger King franchise agreement is not binding on Purchaser after June 2007, and after this sale, Purchaser is entitled to enter into a new agreement with Burger King or any other fast food operator, or no fast food operator, of his choosing." (Filing No.1, Document 1-2, page 10).

in March 2007, and informed Taraghi that BKC did not intend to process his application further.  Padilla followed this phone conversation with a confirming e-mail dated March 19, 2007, in which Padilla stated that BKC declined Taraghi's application to become a franchisee.  (Filing No. 24, Padilla Declaration ¶ 5-7, Ex. 1).

Taraghi's recollection was that he did not hear from BKC following the submission of his application until April 2007, at which time he was contacted by Padilla and informed that his application was denied. Because the June 20, 2007, franchise expiration date was approaching and because Taraghi had not received a more formal notification that his franchise application had been denied, Taraghi retained legal counsel who wrote to BKC on or about June 11, 2007, inquiring about the status of Taraghi's application.  In response to that correspondence, BKC's Stephanie Doan sent an e-mail to Taraghi's counsel stating that BKC had denied Taraghi's application and would not consent to an assignment of the franchise rights to Taraghi. (Filing No. 13, Doan Dec. ¶ 17).  Both Stilmock and Padilla state that they did not know the Ogallala Burger King restaurant was being managed by someone other than SBFF until the time that Western sued Burger King on June 19, 2007. According to Doan, BKC never consented to a transfer of the franchise rights from SBFF to any other party.  (Doan Affidavit ¶ 8.)

There is no dispute that during the time from Pro Mart's sale of the business to HDT through most of August 2007, BKC received royalty payments from the Store No. 9820 in Ogallala, Nebraska, and that Western was sending those payments.  There is no dispute that the BKC issued statements showing its receipt of the royalties, and that those statements were addressed to SBFF, Inc..  There is also no dispute that a form letter, addressed to "Dear Restaurant Manager and Team" from the CEO of Burger King

5

Corporation was sent to the Store No. 9820, to congratulate the store on passing the "Clean & Safe certification conducted by EcoSure." (Filing No. 22, Ex. 1 to T. Wolfgang Aff.)

**ANALYSIS**

***BKC's Alleged Violation of TRO***

As a preliminary matter, the Court finds that Burger King Corporation did not act in violation of a temporary restraining order when it cancelled the bi-weekly delivery of products to Store No. 9820. The temporary restraining order that was issued ex parte by Judge Donald Rowlands was arguably in place until the date that he scheduled the state court hearing on the Plaintiff's motion for a preliminary injunction. Of course, before the hearing could take place, the Defendant removed the case to this Court, and the District Court of Keith County lost jurisdiction over the matter. I conclude that pursuant to Fed. R. Civ. P. 65(b), the ex parte TRO issued by Judge Rowlands dissolved, at the latest, ten days after the removal.

The Plaintiff argues that the TRO should be considered to have stayed in effect until this Court was able to hold a hearing on the motion for preliminary injunction. However, the Plaintiff took no affirmative action immediately upon the removal to protect or maintain the TRO pending the hearing on the motion for a preliminary injunction. A full month after removal, on August 13, 2007, Plaintiff filed a motion for a determination of its motion for preliminary injunction, or alternatively, a hearing on the motion for preliminary injunction. (Filing No. 14). By that time, the state court TRO had dissolved. *See* Fed.R.Civ.P. 65(b); 28 U.S.C. § 1450. The filing of a motion for preliminary injunction in a state court action

6

does not guarantee the continuation of a state-court-issued temporary restraining order after that case has been removed to federal court. *Id.* and see *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda County*, 415 U.S. 423, 437 (1974); *see also Carrabus v. Schneider*, 111 F. Supp.2d 204, 210 (E.D.N.Y. 2000)(stating "there is no reason to believe that a state court TRO issued on notice, and in anticipation of a preliminary injunction hearing, is exempt upon removal to the federal forum from the Rule 65 time limitation that clearly does govern an ex parte TRO in the same circumstances.")  Accordingly, the Court finds that Burger King Corporation's refusal to send product to Store No. 9820 did not violate the TRO.

**Motion for Preliminary Injunction**

The Court's analysis of any application for a preliminary injunction requires the weighing of four factors:

> Whether a preliminary injunction is appropriate depends on four considerations:  the probability that the movant will succeed on the merits; the threat of irreparable harm to the movant should the court deny the injunction; the balance between this harm and the harm that granting the injunction will cause to the other litigants; and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

*Mid-America Real Estate Co. v. Iowa Realty Co., Inc.,* 406 F.3d 969, 972 (8th Cir.  2005). The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir 1994).  "No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetic Corp., v. Lenox Lab, Inc.,* 815 F.2d 500, 503 (8th Cir. 1987), and also citing *Dataphase*.  The issuance of a preliminary injunction will be

7

reversed only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied* 512 U.S. 1236 (1994).

### Likelihood of Success on the Merits

In considering these factors in the present case, the Court views the Plaintiff's likelihood of success most significant. The Complaint alleges four claims: a violation of the Nebraska Franchise Practices Act, Neb. Rev. Stat. §§ 87-401 to 410 (2007), hereafter "NFPA"; tortious interference with a business expectancy or relationship; breach of contract and covenant of fair dealing; and equitable estoppel. Because the Court finds that the Plaintiff has not come forward with any facts to demonstrate that it has any reasonable likelihood of prevailing on the merits, the motion for preliminary injunctive relief will be denied. Each claim will be discussed briefly below.

### Nebraska Franchise Practices Act Claim

The Nebraska Franchise Practices Act affords some protection to parties to franchise agreements in Nebraska. The Act defines a franchise as, "a written arrangement for a definite or indefinite period, in which a person grants to another person for a franchise fee a license to use a trade name, trademark, service mark, or related characteristics and in which there is a community of interest in the marketing of goods or services at wholesale or retail or by lease, agreement, or otherwise...." Neb. Rev. Stat. § 87-402(1)(a). The Plaintiff must demonstrate four elements in order to demonstrate the existence of a franchise under the NFPA:

1. A written agreement;
2. That grants a license to use another's trademark;

8

    3.      The payment of a franchise fee; and

    4.      The existence of a community of interest in the marketing of goods and services.

Neb. Rev. Stat. § 87-402(1)(a).

The Court finds that Western has no proof of the first, second and third elements. As to the first and second, there is no written agreement that grants Western a license to use the BKC trademark. The only written agreement that grants such a license that is in evidence is the Franchise Agreement between SBFF and BKC. Pursuant to that agreement, BKC granted the license to SBFF, and their agreement expressly prohibited SBFF from assigning or transferring that right to another without BKC's written consent. BKC's uncontroverted evidence from Stephanie Doan is that BKC never provided consent for an assignment or transfer of franchise rights relative to the Ogallala store.

As to the third element, there is no evidence that Western has paid a franchise fee to BKC. The evidence that Western has paid "royalties" does not demonstrate that it paid a franchise fee. SBFF's obligation to pay a franchise fee to BKC is addressed in the Franchise Agreement, Non-traditional Facilities Addendum, which substitutes Paragraph 2.2 of the Addendum for paragraph 2 of the Agreement. The royalty payments are covered in paragraph 5 of the Addendum which substitutes a revised paragraph 9.A for paragraph 9.a of the Agreement. (Filing No. 1, Attachment 3, page 17 of 50 marked as Exhibit 1 and Filing No. 1, Attachment 4, pages 2, 3, and 6). They are separate and distinct obligations owed by SBFF to BKC. There is no evidence that Western paid a franchise fee to BKC as required by the NFPA.

Where there is no franchise agreement, the NFPA does not apply. *Home Pest and Termite Control, Inc. v. Dow Agrosciences, LLC,* 2004 WL 240556, *3 (D.Neb. 2004)

(holding that if an agreement is not a franchise, then it is not subject to the Nebraska Franchise Practices Act.) Therefore, the Court holds that the Plaintiff cannot succeed on the NFPA claim.

Western alleges that on October 28, 2006, "Western executed an Addendum to the Agreement that specifically transferred the rights to the Burger King franchise located in the Ogallala convenience store and known as Burger King No. 9820 to Western" and attached a copy of the Addendum to the Complaint as Exhibit B. The problem for Western is that the Addendum states that Pro Mart agrees to transfer whatever rights that it has, but the Addendum's language undeniably acknowledges the possibility that Pro Mart has no franchise rights whatsoever to transfer.

The Addendum states, in part:

> Seller [Pro Mart, Inc.] agrees to transfer any right to the Burger King franchise, **if any and if any rights are transferable**, and to further assist Purchaser to establish a working relationship with Burger King, and/or offers any reasonable assistance to assist Purchaser to establish a working relationship with Burger King, including assistance as Seller may reasonably offer to assist Purchaser in acquiring a franchise agreement from Burger King.

The language of the Addendum is also evidence that Western, through HDT, Inc., had no working relationship or franchise with BKC before the sale. Additionally, there is nothing in the record to indicate that Pro Mart acquired any franchise rights when, on October 26, 2006, Pro Mart purchased the Ogallala convenience store from franchisee SBFF, Inc.

Western relies on *Regnev v. Shasta Beverages, Inc.*, 337 N.W.2d 783 (Neb 1983), in arguing that the NFPA has been construed by the Nebraska Supreme Court to encompass unwritten agreements. That is true, but only in limited circumstances. The NFPA states that "any arrangement, agreement, or contract, either expressed or implied,

10

for the sale, distribution or marketing of *nonalcoholic beverages* at wholesale, retail, or otherwise" also is a franchise.  Neb. Rev. Stat. §87-402(1)(b).  The *Regnev* case involved just such an arrangement concerning Shasta Beverages  – nonalcoholic beverages.  The facts are that there was no written agreement through which BKC granted franchise rights to Western, Hossein Taraghi or his subsidiary, HDT, Inc., and one cannot be implied, as argued by Western, from the parties' customs and practices.  The Court finds no legal support for Western's position in  *Regnev.*  To do so would ignore the plain language of the statute.  For all these reasons, the Court concludes that the likelihood of success on the NFPA claim is non-existent.

### Breach of Contract and Covenant of Good Faith and Fair Dealing

Western also alleges claims based on breach of contract, but there is no evidence of an offer or acceptance, nor is there any evidence of a meeting of the minds that is a prerequisite to finding the existence of a contract, written or verbal.  "[I]n order to establish an express contract [under Nebraska law,] there must be a definite proposal and an unconditional and absolute acceptance thereof."  *Viking Broadcasting Corp. v. Snell Pub. Co., Inc.*, 497 N.W.2d 383, 386 (Neb. 1993).  There must be a meeting of the minds "at every point; nothing can be left open for future arrangement."  *Cimino v. FirsTier Bank, N.A.*, 530 N.W.2d 606, 614 (1995).  "A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement."  *Nebraska Nutrients, Inc. v. Shepherd*, 626 N.W.2d 472, 499 (Neb. 2001).

Western's argument that the conduct of the parties between October 2006 and June 2007 establishes an implied contract ignores the fact that BKC told Taraghi he needed to apply on-line for a franchise, that Taraghi did so, and that his application was unambiguously denied.  Western's on-line application was pending for several months, but when a response came, it was unambiguous, contrary to what the Plaintiff would have the Court believe.  In a March 19, 2007, e-mailed response from Burger King Corporation's Jose Padilla, Taraghi learned that the application was denied. The denial was based on a question of his fitness that arose following an internet search of the Plaintiff and its president showing an allegation of misconduct for which Taraghi paid a fine. The e-mail communication was followed up with a June 18, 2007, letter from Burger King Corporation's Stephanie Doan, who, in response to a June 11, 2007, inquiry from Taraghi's counsel, confirmed that the communication from Padilla was the official response of Burger King Corporation.  The SBFF's franchise rights ended, at the latest, on June 20, 2007. About 60 days later, the shipments to Store No. 9820 ceased.  What transpired over those 60 days, against the backdrop of this litigation, cannot support a finding that there was an implied contract between Western and BKC.

This is not a case of ambiguous communications between Taraghi and Burger King Corporation.  The only evidence of any ambiguity is a form letter, marked as Exhibit 1 to Thomas Wolfgang's Affidavit, which is addressed to Store No. 9820 from the CEO of Burger King Corporation commending Store No. 9820 for its attention to cleanliness. This correspondence does not create a genuine issue of material fact relevant to whether there was some kind of implied agreement between the parties.  There is no evidence to support

12

a finding that there was an implied agreement simply does not exist.  For these reasons, the Court concludes that the Plaintiff has no likelihood of success on the merits.

### Tortious Interference with Business Expectancy

Western alleges that BKC tortiously interfered with its business expectancy.   BKC may have interfered with Western's business plans and expectancy by denying Western's application for a franchise in Ogallala.  However, the Court finds no evidence that BKC's denial was tortious.  In Nebraska, a plaintiff must show the following to succeed on a claim of toritous interference with a business expectancy:

> (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

*Macke v. Pierce,* 661 N.W.2d 313, 317 (Neb. 2003).  A crucial issue is whether BKC's denial of the franchise was "unjustified."[3] The Court finds that the evidence wholly supports BKC's right to deny the franchise to Western.

Paragraph 16 of the Franchise Agreement is dedicated to the conditions and limitations on assignment of the franchise rights.  The paragraph expressly states:

> 16A.  Transfer by Franchisee        Except with the prior written consent of an authorized officer f of BKC, FRANCHISEE shall not (1) assign or pledge this Agreement, or assign any of FRANCHISEE's rights or delegate any of the duties hereunder; or (2) sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any equity securities of FRANCHISEE or

---

[3] Factors that Nebraska courts have  considered in determining whether interference with a business relationship is unjustified include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.  *Macke,* 661 N.W.2d at 317-18.

(3) sell, transfer, convey or give away substantially all of the assets of the Franchised Restaurant.

There is no evidence that BKC consented to the assignment or transfer of rights from SBFF to any party, including to Pro Mart.  Thus, there is no evidence to demonstrate that  Pro Mart had any franchise rights to transfer to Western, which Pro Mart basically acknowledged in the Amendment to the Purchase Sell Agreement.  The Court finds that Western had neither a valid business relationship with BKC nor a valid expectancy to continue operating a restaurant as a BKC franchisee.  Certainly, Western has the right to continue to operate a restaurant from its Ogallala property, but it has no valid expectancy in operating it as a Burger King.

### Equitable Estoppel

Western's fourth and final claim is that BKC should be estopped from denying Western a franchise based on BKC's decision to continue sending the supplies needed to operating the restaurant through August 2007 and on BKC's acceptance of monthly royalties from Western.  "[T]he doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed."  *Burns v. Nielsen*, 732 N.W.2d 640, 649 (Neb. 2007).  To the extent Western relied on being granted a franchise from BKC when it purchased the convenience store in Ogallala, there is no evidence to support a finding that such reliance was in good faith.  The contract between Western and Pro Mart refers to the franchise agreement and the extension agreement between BKC and SBFF, but only the extension agreement was made an attachment to the Purchase and Sell Agreement.

14

There is no evidence that Western's Taraghi requested a copy of the Franchise Agreement or that he read it. Had he done so, he might have questioned whether Pro Mart had any right to the franchise, and he would have learned that BKC reserves the right to consent to any transfer or assignment of franchise rights. The first information that Taraghi received from a Burger King representative following his purchase of the Ogallala convenience store was that an on-line application had to be completed. The first response and all subsequent responses to Taraghi's application for a franchise was unambiguous denial. The reason for the denial was explained to Taraghi in a phone call, and was due to "various publicized incidents affecting character." Doan explained that Taraghi was accused in Colorado of selling gasoline with a lower Octane level than was posted, and for which Taraghi paid a fine.

Western wishes to rely on the custom and practice of operating the restaurant that developed between Western and BKC from the date of the sale on October 28, 2006, through most of August 2007. The restaurant continued operating under the Burger King sign; Western continued sending in royalties; and BKC continued to accept the royalties. However, Western knew from the Amendment to the Purchase and Sell Agreement that the franchise had been extended to the benefit of SBFF, and guaranteed by W.D. Sapp, only until June 20, 2007. The extension agreement did not mention Western, and the statements acknowledging the royalty payments were addressed to SBFF, not Western. For all these reasons, the Court finds that Western cannot prevail on its claim for equitable estoppel.

The Court concludes that the facts supporting the Plaintiff's claims for relief are few and, even when considered in a light most favorable to Western, fail to show that Western has any likelihood of succeeding on the merits of these claims.

**Other Dataphase Factors**

The Plaintiff may be able to show the threat of immediate harm, that is the closure of the restaurant, particularly in light of Burger King Corporation's refusal to send product to the restaurant as of last week.  Nevertheless, this threat of immediate harm is not the kind of irreparable harm that preliminary injunctive relief is intended to prevent.  Even if the plaintiff were to prevail on the substance of its claims, the Court finds that it could be compensated with monetary damages.  Further, the Court is not convinced that the "small town talk" that may be inspired by the restaurant's closure will adversely affect the Plaintiff or its reputation in a manner that would cause it irreparable harm.

The interests of other parties associated with the litigation include the interests of the people who work at the restaurant.  Those persons are employees of the Plaintiff, not of Burger King Corporation, and they may lose their jobs if the restaurant closes.  While this may pose a real, though individualized, hardship for these employees until they find other employment, their interests alone do not justify issuance of a preliminary injunction in this case.

The public interest is served by upholding the intent of the Nebraska Franchise Practice Act, which does not support the recognition of franchise rights where there are no facts to show that a franchise agreement was formed.  There was no evidence that there is a shortage of restaurants for travelers to and through the Ogallala area, and so the

public will not be harmed by the closure of one Burger King Restaurant, at least for the time being.

Based on the Court's consideration of the four *Dataphase* factors, the Plaintiff's motion for preliminary injunction will be denied.

**Motion to Dismiss, or Alternatively, To Transfer**

BKC moves to dismiss the case, or, in the alternative, to transfer it to the United States District Court for the Southern District of Florida.[4]  BKC argues that the matter should be dismissed based on improper venue under either Fed. R. Civ. P. 12(b)(3) or 12(b)(6).  BKC makes two arguments.  First, BKC would have the Court enforce a forum selection clause contained in the Franchise Agreement between BKC and SBFF against Western.  The forum selection clause identifies the U.S. District Court for the Southern District of Florida as the appropriate forum for controversies arising from the agreement (or, alternatively, a state court in southern Florida).   Alternatively, BKC asks the Court to transfer the case pursuant to 28 U.S.C. § 1404, to the Southern District of Florida where it has commenced an action against SBFF and Western based on SBFF's breach of the Franchise Agreement.  In that case, Western has filed a motion to dismiss based on the Florida federal court's lack of personal jurisdiction over it.

Although BKC has consistently argued that it does not have a franchise agreement with the Plaintiff, BKC relies on *Marano Enterprises v. Z-Teca Rest. L.P.,* 254 F.3d 753, 757-58 (8th Cir. 2001), to argue that Western is so closely related to the franchise

---

[4] *Burger King Corporation v. S.B.F.F., Inc., W.D. Sapp, and Western Convenience Stores, Inc.,* Case No. 07-21645-CIV Highsmith/McAliley, has been stayed pursuant to the first-filed rule. (Filing No. 18, Sharp Aff. At Ex. A)

agreement between SBFF and BKC that Western should be bound by the franchise agreement's forum selection clause. The *Marano* Court reasoned that the principal of a corporation, which corporation had agreed to a forum selection clause in a contract, in his capacity as a shareholder, officer, and director, was so closely related to the corporation that it was fair to impose the forum selection clause on the principal, even though he was not personally a party to the contract. *Id.* at 757. "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (cited in *Marano*).

The Court finds that a similar "closeness" of relationship is not present in this case. Western was never a party to the Franchise Agreement, nor were any of its associates, Taraghi or HDT. While Western's Complaint could be read to claim rights under the Franchise Agreement, Western made clear during the preliminary injunction hearing that it claims no rights directly flowing from the Franchise Agreement. The Court has found, as explained above, that Western has no rights under the Franchise Agreement. Western does not influence, direct , or control any party to the Franchise Agreement, and for these reasons, the Court concludes that Western is not so closely related to the franchise agreement between SBFF and BKC that it would be fair to impose the forum selection clause upon it. The Court concludes that the forum selection clause does not require dismissal or transfer to the Southern District of Florida.

Having found that the franchise agreement's forum selection clause is not controlling in this case, and finding that venue is proper in the District of Nebraska, the Court could consider whether the matter should be transferred pursuant to 28 U.S.C. § 1404.

18

However, for two reasons, the Court will not transfer the case to Florida. The first reason is that Western has raised the defense that the federal court in Florida lacks personal jurisdiction over it.  That issue is not this Court's concern, except that the Court finds it is inadvisable to transfer a case under Section 1404 to a court that may not have jurisdiction over one of the parties when the parties all admit this Court's jurisdiction over them.

The second reason is dispositive.  The Court concludes that this case should be dismissed with prejudice because the Plaintiff has utterly failed to come forward with any evidence to support its claims against BKC. Defendant brought this motion to dismiss pursuant to 12(b)(3) and 12(b)(6) based on improper venue, and because I have considered evidence outside the pleadings in connection with the Defendant's motion and with the motion for preliminary injunction, and because both parties have been afforded an opportunity to provide the Court with evidence to support their positions, I have decided to convert the motion to dismiss to one for summary judgment under Fed. R. Civ. P. 56. [5]

> Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.  Our court has interpreted the phrase "matters outside the pleadings" to include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gibb v. Scott,* 958 F.2d 814, 816 (8th Cir.1992) (citation omitted).

*Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc,.* 187 F.3d 941, 948 (8th Cir. 1999). The Court of Appeals for the Eighth Circuit has recently reiterated that "[a] district court can enter summary judgment sua sponte if 'the losing party was on notice that [it] had to come

---

[5] If conversion is not technically appropriate because the basis of the Rule 12(b)(6) motion is improper venue, then the Court will grant summary judgment for the Defendant sua sponte.

forward' with its relevant evidence." *Nunley v. Department of Justice*, 425 F.3d 1132, (8th Cir. 2005) (quoting *Stone v. General Motors Corp.*, 400 F.3d 603, 607 (8th Cir. 2005)).

The motion for preliminary injunction was outstanding when the case was removed to this Court. Evidence was submitted at the time the motion was filed, and more evidence was submitted before the hearing (Filing No. 22). The Court afforded the parties the opportunity to present additional evidence during the hearing on August 30, 2007, and evidence was received. Certainly, Western was "on notice that it had to come forward with its relevant evidence." Even so, Western presented insufficient evidence to support its claims.

I have considered all the evidence and I conclude that there are no genuine issues of material fact remaining for trial. There was a time after Western's purchase the Ogallala convenience store in October 2006 when Western was hoping to receive franchise rights from BKC. Western applied for them, and Western continued operating a Burger King restaurant and paid the royalties owed to Burger King under Burger King's Franchise Agreement with SBFF. Then, sometime in March 2007, and certainly after March 19, 2007, Plaintiff had actual knowledge that its application for a franchise had been denied by BKC. Nevertheless, Western continued to operated the restaurant as a Burger King. The Court finds that it did so at its own risk, and without any contractual protection. BKC did not conceal information from Western or its principals, and took no action to induce Western to continue operations. The Court finds that the evidence is simply insufficient to support the Plaintiff's claims, and that the Defendant is entitled to summary judgment as a matter of law.

IT IS ORDERED:

20

1.     The Plaintiff's Motion for Preliminary Injunction (filed as part of Filing No. 1) is denied;

2.     The Defendant's Motion to Dismiss (Filing No. 11) is granted in part and denied in part as follows:

   a.     To the extent Defendant's Motion to Dismiss was based on the Forum Selection Clause, the motion is denied;

   b.     The motion to dismiss under Fed. R. Civ. P. 12(b)(6) is converted by the Court to a motion for summary judgment under Fed. R. Civ. P. 56, and is granted;

3.     All other pending motions are denied as moot;

4.     The Complaint and all claims against Defendant Burger King Corporation are dismissed with prejudice; and

5.     A separate judgment will be entered.

DATED this 7th day of September, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge